Receipt number AUSFCC-8541341

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| OXFORD FEDERAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. **23-288 C** |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Oxford Federal, LLC (hereafter also referred to as "Oxford"), by the undersigned counsel, alleges as follows for its Complaint:

## PARTIES

1.     The Plaintiff is a limited liability company organized under the laws of the State of Colorado, and has been performing work for the U.S. Army Corps of Engineers ("USACE") in Israel since 2008 and up to the year 2020 had successfully performed approximately thirty construction projects.  Oxford received performance ratings of satisfactory and above on all of its projects and was never terminated for default.

2.     As recently as July, 2021, during which time Oxford was performing the contract that is the subject of this action, the Defendant advised their Israeli counterparts about Oxford's founder and CEO, as follows:

> Expert Qualification: Mr. Jarred Yaron is a highly skilled construction manager with over 20 years of experience in project management and quality control of large multidisciplinary projects valued at over USD $100 Million.  Mr. Yaron spends time visiting every project working directly with Project/ Program management ensuring efficient and effective delivery.  He attended Columbia University in New York City where he studied business.  Mr. Yaron has been building projects for USACE in Israel since 2008 and will spend long periods of time in

country ensuring important milestones are achieved.  Since 2001, Mr. Yaron has secured and built projects in the United States, Europe, and Israel applying hands on project delivery benefiting his team and clients.

3.      Defendant is the United States of America ("Defendant" or "USACE"), acting by and through the Europe District of USACE.

## JURISDICTION

4.      This project was solicited under the U.S. Department of State's Foreign Military Sales ("FMS") program in Israel that requires that American-funded construction contracts be administered by USACE and awarded to American prime contractors for the ultimate benefit of the State of Israel acting through the Israeli Ministry of Defense ("MOD").

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 7101 et seq.  This action is a timely appeal pursuant to the CDA of the Contracting Officer's final decision terminating the contract for default dated March 1, 2022.

6.      This action seeks the conversion of the Termination for Default on a construction contract to a Termination for Convenience of the Government.

## BACKGROUND

7.      The Defendant issued Solicitation No. W912GB19R00150002 on January 25, 2019 for a project titled Site 13664 – Israel (often referred to as the "Ammunition Storage Facility" or "Ramon") to be performed at the Ramon Air Force Base, southwest of Beersheba, Israel.

8.      The project's scope of work involved the design and construction of new ammunition facilities and access roads to and around those facilities in support of the Israeli

MOD.  This effort included constructing a number of buildings and structures as well as performing necessary site development, mechanical, plumbing, and electrical work.

      9.    The Solicitation was competitively negotiated under the procedures in FAR, Part 15, and the Plaintiff was determined to be the best value under applicable source selection procedures.

      10.    Contract No. W912GB19C0016 was awarded to the Plaintiff on April 5, 2019 in the amount of $18,144,550.00.

      11.    As awarded, the Contract divided the work, for payment purposes, into six (6) Contract Line Item Numbers ("CLINs"), delineated as follows:

CLIN No. 0001: Design & Construct Lg Storage Facility (Buildings A & B)
CLIN No. 0002: Design of Remaining Facilities
CLIN No. 0003: Construction of Maintenance Complex (Building L)
CLIN No. 0004: Construction of Equipment Integration Plant (Building P)
CLIN No. 0005: Construction of Roadways
CLIN No. 0006: Design of Additional Items

      12.    The Notice to Proceed ("NTP") was issued on May 9, 2019**.**

      13.    The original Contract Completion Date for CLIN 0001 was May 13, 2020 (365 days after NTP), which was later extended to August 7, 2020, and the Contract Completion date for the remaining CLINs was December 19, 2020 (585 days after NTP).  Modification No. A00003, effective November 13, 2020, deleted CLIN 0006 from the Contract.

      14.    The Contract was structured on a design-build basis and required an approved design that was to be furnished by the Plaintiff before construction could commence.

      15.    The project had proceeded through the design phase and the commencement of construction and was impeded by actions of the Defendant, and the world-wide COVID-19 pandemic.

16.     On March 14, 2020, Israel implemented extreme restrictions intended to halt the spread of the virus and these measures included travel limitations, school closures and, on March 16, 2020, public and private businesses were directed to keep their workers at home.

17.     Closures were relaxed somewhat in May 2020, but were re-implemented from time to time as the spread of the virus continued.  On September 10, 2020, it was reported that Israel had the highest per capita infection rate of any country in the world.

18.     These restrictions impeded the ability of the design team to work efficiently on a collaborative, in-person, basis in a common workplace.

19.     On June 7, 2021, the Contracting Officer, LTC Christian H. Solinsky, issued a "Letter of Concern" to the Plaintiff and, with regard to the Ammunition Storage Project, stated that the project was "220 days behind the overall schedule" and that he was concerned about "poor quality control and schedule management."

20.     The Plaintiff, during this time, was impeded by a lack of cooperation by the Defendant and the on-going COVID-19 pandemic.

21.     Oxford attended a meeting on June 25, 2021 with the Contracting Officer and other USACE personnel and explained the steps the company was taking to address the concerns expressed in the June 7, 2021 letter.

22.     Up to June 7, 2021 and for the months that followed, as will be more fully explained in Count II, Oxford continued to perform work on the project, but experienced Government-caused delays and excusable delays resulting from the impact of COVID-19. Without regard to the cause of the delay, the Defendant refused to grant, or even consider, requested time extensions and continued to unreasonably reject schedule updates as "non-

compliant." The Defendant also refused to grant, or even address, time extensions resulting from Contract modifications.

23. On December 30, 2021, immediately before the New Year's holiday weekend, the Contracting Officer issued a "Cure Notice" listing what was termed as a "collection of failures," and threatened a termination for default unless these alleged "failures" were cured within 10 days.

24. It was unknown to Oxford at the time that the Contracting Officer had already set a plan in motion to unfairly and improperly terminate the Contract for default and, in fact, to further prevent Oxford from performing any further work for USACE in Israel or anywhere else within the Europe District's area of responsibility. The Contracting Officer's statements and actions demonstrated a specific intent to injure Oxford.

25. The Defendant's administrative actions that followed were in furtherance of that plan in order to "paper the record" and place Oxford in a continuing defensive posture making it difficult to address the various unfounded accusations of the Contracting Officer.

26. The Cure Notice alleged that Oxford had failed to:

a) submit a contract compliant schedule with an anticipated end date

b) submit an updated progress schedule

c) perform asphalt works in side Buildings A and B

d) construct the flooring in accordance with levelness requirements

e) conduct a roof leak test at Buildings A and B

f) close deficiencies in cladding in Buildings A and B

g) install storage tents in accordance with contract requirements

h) dismantle deficient tent works at Buildings A and B

i) properly place concrete at Site P and L

j) maintain quality control and close out deficiencies

k) ensure a safe working environment at the site

27.     The Cure Notice further alleged that the work at Sites A and B was 596 days behind schedule and that the work at Sites P and L was 376 days behind schedule.

28.     The Defendant's allegation that the work was behind schedule was not supported by a critical path delay analysis and gave no consideration to mitigating factors including the impact of the COVID-19 pandemic, or to numerous Government-caused delays that entitled Oxford to a substantial time extension that had been previously requested.

29.     On January 14, 2022, the Plaintiff responded to each of the allegations in the December 30, 2021 Cure Notice and explained that many of the Defendant's assertions were factually incorrect, exaggerated, addressed items for which the Defendant was responsible, or included items where any needed remedial measure had already been undertaken by Oxford. The Plaintiff also expressed its intent to successfully complete the project.

30.     The Defendant did not respond to the Plaintiff's January 14, 2022 letter that addressed the issues raised by the Cure Notice.

31.     The Defendant obstructed the extent to which remedial measures could be conducted onsite by wrongfully suspending the work, unreasonably rejecting qualified personnel replacements, and not accepting a new QC Manager and QC Civil until February 2, 2022.

32.     The Defendant met with Oxford in Tel Aviv on February 1 and February 3, 2022, and stated that the Government intended to cooperate with Oxford in its efforts to progress the project.  The Defendant already had received Oxford's January 14th response to the Cure Notice and expressed no dissatisfaction with its responses.

33.     Nevertheless, only one week later, on February 9, 2022, after expressing its intent to cooperate with Oxford, the Defendant issued a Show Cause letter that only tacitly stated that consideration had been given to Oxford's January 14, 2022 response to the Cure Notice, and then went on to state that it considered all but one of the items to be "unresolved." These allegedly "unresolved" issues were not brought up at the February meetings, and there was no further opportunity afforded to Oxford to explain its position or to discuss any responses that were considered by the Defendant to be insufficient.

34.     Oxford provided a point by point response to the Show Cause letter on February 18, 2022 and explained that the items had either already been remedied, were factually inaccurate, or were being addressed by remedial action that was underway.

35.     Although Oxford expressed its disagreement with the allegedly deficient items, it nevertheless stated its intent to comply with the Defendant's directives.

36.     Oxford was not given a fair and reasonable opportunity to accomplish the "cures" that were underway and of which the Defendant had knowledge.

37.     The Defendant failed and refused to acknowledge, or even consider, mitigating circumstances, or Oxford's response to the Show Cause letter, and subsequently terminated the Contract for default by letter dated March 1, 2022.  The following reasons were stated by the Government as the basis for the default:

(a) Failure to maintain quality control, promptly address and close out contract deficiencies

(b) Failure to ensure a safe working environment on site

(c) Failure to construct flooring at Site A and Site B in accordance with levelness and flatness requirements

(d) Failure to conduct a roof leak test at Building A and Building B upon completion

(e) Failure to close deficiencies in cladding at Building A and Building B

(f) Failure to install storage tents in accordance with contract requirements

(g) Failure to dismantle deficient tent works in Building A and Building B which now conceal deficient cladding

(h) Failure to properly place concrete at Site P and Site L

(i) Failure to submit a contract compliant schedule with an anticipated end date

(j) Failure to submit an updated progress schedule

38.    These stated reasons were essentially the same ones that had been alleged in the Cure Notice and Show Cause letter, but there was no consideration of Oxford's responses, the curative measures that were under way that could not possibly be accomplished overnight, or the fact that the actions that were underway would certainly be completed well before a new contractor could be substituted under the Termination for Default clause.

39.    The stated reasons for the default were either incorrect or exaggerated, and neither individually nor collectively provided sufficient legal support for the drastic action of a termination for default.

40.    At the point USACE terminated the Contract, the project was approximately 75% complete with Oxford's requests for substantial time extensions still awaiting USACE

disposition.  To date, these time extension requests have never been administratively addressed yet USACE's termination notice claimed that Oxford failed to diligently prosecute the work and demonstrated an inability to meet the required period of performance.

41.    Oxford replaced certain key personnel who had been unfairly criticized by the Defendant and did everything possible to demonstrate its commitment to successful completion of the project.  Nevertheless, with the exception of one progress payment in the amount of $181,312.00, paid on August 25, 2021, Oxford received no payment after June 28, 2021, despite incurring considerable expenses related to maintaining its workforce and continuing to perform work on the project.

42.    Oxford experienced numerous difficulties in the performance of the project resulting, in principal part, from compensable Government-caused delays, non-compensable excusable delays, changes, and delays that were exacerbated by an overarching breach of the implied covenant of good faith and fair dealing, which includes the duty to cooperate and not hinder performance, as will be addressed below.

43.    On December 1, 2022, Oxford submitted a certified claim, under the authority of the Contract Disputes Act, for a time extension of 744 calendar days.  The requested time extension was not granted and the Contracting Officer did not issue a Final Decision within 60 days or notify Oxford of the time within which a Final Decision would be issued as required by the Contract Disputes Act.  Oxford will be filing a deemed denial appeal and will request consolidation with this action at the appropriate time.

44.    As of the date of the termination, March 1, 2022, Oxford had invoiced for $754,932.00 that remained unpaid.

45.     The Termination for Default was arbitrary and capricious and failed to consider and comply with the requirements of FAR 49.402-3(f).

46.     The Defendant failed to give any consideration to excusable delay or to any mitigating circumstances.

47.     The Defendant failed to consider whether Oxford, with the remedial efforts that were underway, would complete the project at least as soon as, and probably much sooner than, a successor contractor could have performed the unfinished work.

48.     At no time did Oxford refuse to perform, abandon performance, or fail to diligently prosecute the work despite the unreasonable and improper requirements of the Defendant.

49.     The Defendant ignored "any other pertinent facts and circumstances," as required by the FAR, such as the difficulty in hiring new key personnel and subcontractors in the midst of the COVID-19 pandemic.

50.     The Defendant made its termination decision before giving due consideration to Oxford's revised and most recent schedule.

51.     The Defendant failed to grant appropriate time extensions, to consider mitigating circumstances, and to permit the continuation of remedial actions that were underway that would have resolved all of the alleged justifications for the termination for default.

52.     Accordingly, the Termination for Default should be converted to a Termination for the Convenience of the Government pursuant to FAR 49.2.

10

## COUNT I – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

53.     Oxford reasserts the allegations contained in the paragraphs above and incorporates them herein by reference.

54.     Implied in every government contract is the duty of the Government to treat the contractor fairly and act in good faith.

55.     The Government must take active steps to enable the contractor's performance and must not willfully or negligently interfere with such performance.

56.     The covenant also imposes a duty of the Government to cooperate with the contractor and to refrain from acting in a way that denies the contractor's reasonable expectations about the fruits of the contract.

57.     It was no coincidence that Oxford's previously excellent relationship with the Defendant's Europe District deteriorated after LTC Solinsky assumed Contracting Officer responsibilities following the retirement of his predecessor in October 2020.

58.     It was apparent that the faulty administration of the Contract by USACE, and its failure to promptly address easily correctable issues and cooperate with Oxford in a spirit of partnering, were inhibiting progress on the project.

59.     The Defendant was aware of the steps that Oxford was taking in response to both the Cure Notice and the Show Cause letter on the Ramon project, including the fact that Oxford was continuing to spend money that the Defendant failed to reveal it had no intention of reimbursing.

60.     The previously referenced June 7, 2021 Letter of Concern not only addressed the Ramon project that is the subject of the appeal, but also expressed concerns about two other

11

on-going projects: Contract W912GB18D0032 Task Order W912GB21F023, Design-Bid-Build

Project: Sites 13780 & 13699 (referred to as "Nevatim"), and Contract No. W912GB18D0032 /

Delivery Order No. W912GB20F0134, DB Central INF Northern Cooking Plant, Israel

(referred to as "Navy Kitchen").

61.     At the previously referenced meeting that was held with the Contracting Officer

on June 25, 2021, Oxford took responsibility for some of the issues, explained mitigating

circumstances, and provided the details of the efforts that were underway, and planned, to

address all of the concerns.

62.     The Contracting Officer expressed no disagreement with what Oxford proposed

and Oxford believed that it would be given a reasonable opportunity to address, and eliminate,

the Contracting Officer's concerns.  The Contracting Officer stated that he was unaware that

Oxford had furnished requests for additional time, supported by Time Impact Analyses

submitted over a year previously, and he promised responses in the near future.  The responses

were never furnished.

63.     Surprisingly, later on the very day of the June 25, 2021 meeting, the Contracting

Officer issued a 10-day Cure Notice on the Nevatim project, and this was followed up with a

Show Cause Notice on July 19, 2021, only two weeks after Oxford had responded to the Cure

Notice.

64.     It became apparent, over time, that this was all part of a plan being implemented

by the Contracting Officer, in the form of a programmatic assault on all of Oxford's current and

sought-after projects in Israel, that was intended to prevent Oxford from receiving any further

work in Israel and, ultimately, to bring about the financial ruination of the company.

65.     While the three projects that were listed in the June 7, 2021 Letter of Concern were on-going, Oxford was continuing to bid projects in Israel.  For example, on January 5, 2021, USACE informed Oxford that it had been included in the competitive range after evaluation of its proposals on two Multiple Award Task Order Contract ("MATOC") solicitations, Solicitation Nos. W912GB20R0011 and W912GB20R0013, for anticipated construction projects in the northern and southern part of Israel, respectively.  The contract awards were still pending as of June 7, 2021.

66.     On June 9, 2021, USACE informed Oxford that it was not selected as the awardee on another Israel construction project: Solicitation No. W912GB21R0006 Site 13850/13851.  Oxford requested a debriefing from USACE the same day.  On June 10, 2021, USACE acknowledged Oxford's request for a debrief on the Site 13850 project and informed Oxford it would schedule one as soon as possible.  USACE never provided Oxford the requested debrief.   On information and belief, Oxford presented an awardable proposal and was improperly denied an award by the Contracting Officer.

67.     The Contracting Officer, LTC Solinsky, informed Oxford at the June 25th meeting that he was delaying the MATOC award pending Oxford's progress on the Nevatim project, even though he had no intention of making an award to Oxford under any circumstances.  In fact, although not disclosed to Oxford, USACE had already awarded the North MATOC to seven awardees on June 22, 2021.  At that time, no Cure Notice or Show Cause letter had been issued to Oxford on any projects and, on information and belief, the Source Selection Board had recommended Oxford for award.

68.     Despite Oxford's efforts to make progress on the Nevatim project, the Contracting Officer and other USACE representatives continued to impede progress by refusing to approve qualified personnel, by refusing to approve revisions to the schedule, and by refusing to recognize Government-caused and excusable delays.

69.     On September 8, 2021 the Nevatim project was terminated for default, but this was later converted to a Termination for Convenience when Oxford and its surety tendered a completion contractor.  An agreement was entered into whereby Oxford waived its right to file claims, and succumbed to the Contracting Officer's demand that it not bid any further work in Israel for a period of two years.

70.     Oxford believed that the Termination for Default was wrongful and that it could prevail on an appeal.  It nevertheless agreed to the no-cost Termination for Convenience in order to promptly remove an unjustified "black mark" from its record and to focus on successful completion of the other two projects (Navy Kitchen and Ramon).

71.     The Contracting Officer led Oxford to believe that USACE would be cooperative in approving key personnel and schedule revisions in an effort to facilitate Oxford's successful completion of the other two projects.

72.     What must not be overlooked is that Oxford continued to finance the work on all of these projects, at a cost of millions of dollars, without receiving any compensation from USACE on any of the three projects after January, 2021, when it received $324,974 on the Navy Kitchen Project, with the exception of one payment in the amount of $181,312.00 on Ramon in August 25, 2021.

73.     Incredibly, between the time when the Nevatim project was awarded on December 16, 2020, and Terminated for Convenience in February, 2022, Oxford did not receive a single Contract payment, despite being under Contract for almost two years and performing work that the Defendant accepted and was available to the follow-on contractor.

74.     The Defendant was unjustly enriched by accepting, but not compensating Oxford for work it performed on three projects.  The costs incurred by Oxford included design and physical construction, administrative costs that Oxford was incurring in an effort to comply with the Defendant's unreasonable personnel qualification requirements, unnecessary schedule revisions, unwarranted design disapprovals, as well as the impact of travel restrictions and limitations.

75.     Oxford did not abandon the work, continued to perform the work, and did everything possible to satisfy the unreasonable demands of USACE so that it could continue to perform work in Israel.

76.     Despite its continuing good faith efforts to make progress on all three projects, the Contracting Officer commenced a flurry of actions against Oxford during the December 2021 holiday season.

77.     On December 23, 2021, the Contracting Officer issued a Cure Notice on the Navy Kitchen project and on December 30, 2021 a Cure Notice was issued on the Ramon project as well (referred to previously in this Complaint).  Both of these Cure Notices were responded to in a timely manner by Oxford.

78.     Without any discussion, or apparent consideration of Oxford's responses, the Contracting Officer issued Show Cause Notices on the Navy Kitchen project on February 4, 2022 and on Ramon on February 9, 2022.

79.     Contrary to the spirit of cooperation that Oxford expected, however, USACE continued to place obstacles in the path of progress on the remaining two projects by issuing unreasonable design and schedule rejections, refusing to approve key personnel who were undoubtedly qualified, refusing to recognize compensable and excusable delays, refusing to pay for accepted work, and by generally making it impossible for Oxford to proceed in an efficient manner.

80.     On February 10, 2022, under threat of a termination for default, Oxford agreed to accept a no-cost Termination for Convenience on the Navy Kitchen project, even though it had been delayed by unreasonable denials of its design submittals.  In fact, Oxford pointed out that the Defendant's conceptual design for the project was flawed and that it needed to make substantial corrections in order to comply with Israeli building codes.

81.     Once again, Oxford accepted a Termination for Convenience to preserve its record of never being terminated for default in an effort to do everything possible to survive and continue to do business in Israel.

82.     Oxford reasonably believed that it was entitled to a conventional cost-reimbursable Termination for Convenience on the Navy Kitchen project because a flawed Government conceptual design, coupled with administrative delay and indecisiveness, prevented progress on the project.

16

83.     Oxford learned later that the Defendant had previously been informed that its customer no longer wanted the project and that a Termination for Convenience, entitling Oxford to all of the costs it incurred up to the time of the termination, would have been appropriate.  The Defendant acted in bad faith by deceiving Oxford to into accepting a no-cost Termination for Convenience under the threat of a Termination for Default.  This was one of many acts of bad faith that permeated the Contracting Officer's administration of Oxford's proposals and contracts, culminating in the Ramon Termination for Default that is the subject of this appeal.

84.     There were two very divergent paths that were being pursued by Oxford and by the Contracting Officer.  While Oxford was doing everything possible, at considerable expense, to cure alleged deficiencies in order to avoid the threatened termination for default, the Contracting Officer was doing everything possible to bolster a justification for his planned termination of Oxford.

85.     Rather than assisting Oxford in managing and mitigating its expenses on the project, the Defendant turned a blind eye to the good faith actions that Oxford was exhibiting and actually exacerbated those expenses knowing, full well, that a Termination for Default was imminent and that Oxford would not be compensated.

86.     In an effort to do everything possible to address the Defendant's concerns, Oxford went to the considerable expense, in February 2022, of hiring a new Quality Control Manager and a new Site Superintendent, and brought them to Israel.  In addition, Oxford hired and submitted for approval on February 23, 2022 a new Project Manager, who was quickly approved by the Defendant even though it knew that a termination for default was imminent.

87.    The Defendant was also aware, during February 2022, that Oxford's subcontractor was preparing to perform remedial work involving the tent and concrete floors in Buildings A and B, as requested.

88.    Oxford submitted Corrective Action Plans ("CAPs") to demonstrate how it intended to remedy work that the Defendant alleged was deficient, but then refused to allow Oxford to implement those CAPs.  Indeed, throughout the fall and early winter of 2021, and prior to the December 30, 2021 Cure Notice, Oxford had submitted and received approval for eight CAPs (from August 26, 2021 to December 19, 2021) related to concrete work.  However, USACE's December 16, 2021 unwarranted suspension of work and unjustified dismissal of Oxford's QCM and QC Civil prevented Oxford from executing those CAPs and remedying the related deficiencies prior to USACE's termination action.

89.    On one occasion, upon information and belief, the Defendant rejected a CAP that had been submitted by Oxford and then used the CAP in the solicitation of a replacement contractor to perform the work exactly as Oxford had described it in its CAP.

90.    The Defendant allowed these and other remedial steps to continue even though the decision had secretly, and certainly without disclosure to Oxford's management, been made to terminate Oxford without regard to any remedial steps that Oxford was taking in response to the Cure Notice and Show Cause letter.

91.    The Defendant continually favored form over substance and allowed minor administrative matters to impede Oxford's work while, at the same time, contending that the project was urgent.

92.     It was often necessary to hire English-speaking personnel, with the necessary technical qualifications, from places outside of Israel. The Defendant, with the full knowledge and endorsement of the Contracting Officer, repeatedly rejected the submission of eminently qualified key personnel by Oxford for reasons that were minor, immaterial, and generally unfounded.

93.     The Defendant gave no consideration to the impact of the COVID-19 pandemic and the related travel restrictions, and the fact that concern about health and safety made it difficult, and in some cases impossible, to attract qualified contractor personnel to travel to Israel, particularly since they could not be accompanied by their families. For example, on December 24, 2021, Oxford informed the ACO that its exceedingly qualified SSI candidate backed out of employment with Oxford due to his family's ongoing concern with COVID-19 and the associated travel risk with the pandemic. This forced Oxford to find another qualified SSI candidate who was willing to take on the risk and go to Israel.

94.     In fact, even the hands-on CEO of Oxford, Jarred Yaron, who was active in project management, was prevented from traveling to Israel and being directly involved in the administration of the project for an extended period of time. When Mr. Yaron was able to enter Israel in early June 2021, he was subjected to a state-imposed quarantine as well as strict visa requirements and enforcement, which caused him to have to exit and re-enter the country on multiple occasions during the summer of 2021.

95.     The Defendant improperly and unreasonably refused to approve Oxford's schedule updates, rejecting them on multiple occasions, and then relied upon Oxford's

19

purported failure to have a "Contract compliant schedule" as a basis to deny project payments and to threaten termination for default.

96.    The Contracting Officer frequently communicated with Oxford's surety, in a manner that went far beyond any legal responsibility that the Defendant had to keep the surety informed, in order to attempt to leverage the surety against Oxford. This amounted to improper, and indeed tortious, interference by the Defendant in the business relationship between Oxford and its surety.

97.    The Contracting Officer ignored the fact that Oxford was willing to defer disputes for another time, and had responded with detailed plans on how it was going to complete the project, including putting in place new subcontract agreements and drafting several CAPs and work submittals, in response to the Cure Notice and Show Cause letter.

98.    The Defendant refused to allow Oxford to implement CAPs that had been approved and then cited Oxford's failure to cure in its Show Cause and Notice of Default letters. It was impossible for Oxford, as it would have been for any contractor, to cure allegedly deficient work if it was not permitted to proceed with the approved CAPs whose very purpose was to accomplish the cures.

99.    The Contracting Officer effectively set up Oxford to fail and then terminated Oxford for default without regard to its good faith efforts to appropriately address the Defendant's concerns, including those with which Oxford disagreed, and without fair consideration of whether the Plaintiff was entitled to a time extension.

100.    The Contracting Officer was well aware of the considerable amount Oxford was owed for Contract work previously performed, and was also aware of the considerable expenses Oxford was incurring in its efforts to address the Cure Notice and Show Cause letter.

101.    The Defendant deceitfully allowed, and indeed encouraged, Oxford to continue its remedial efforts knowing full well that those efforts were to no avail given the pre-determination that Oxford was going to be terminated for default.

102.    The Defendant failed to afford Oxford an opportunity to mitigate potential damages and ignored the fact that Oxford was continuing to incur expenses that it believed were necessary to comply with the Defendant's directives, while knowing that USACE had no intention of reimbursing Oxford for those expenses.

103.    The Defendant interfered with Oxford's company and project management by refusing to allow key personnel employed by Oxford to attend project meetings and often restricted those in attendance from addressing issues that were under discussion.

104.    The Defendant engaged in abusive treatment of Oxford and its subcontractors' personnel with the full knowledge, and lack of concern, of the Contracting Officer.

105.    The Defendant's Quality Assurance Representative ("QAR"), Jason Eckstein, in particular, was extremely abusive and bullying in his treatment of both Oxford's and its subcontractors' personnel.  For example, on or about July 12, 2021, a contemporaneous daily report documented that Mr. Eckstein "threw a cleaning woman out of his office while she was attempting to clean the space.  The QA shouted at the woman in a crazy manner, intimidated the woman with his size and body language and the woman was frightened and broke down and

21

cried.  The woman is also legally deaf.  The COR was present during this occasion and did

nothing to stop the attack of the woman."

106.    On August 31, 2021, the Defendant acknowledged a formal complaint about Mr.

Eckstein's abusive conduct on other occasions, with particular reference to his abusive conduct

toward the foreman of a subcontractor.  This event then became the subject of a request for a

formal investigation that involved interviews by USACE of a number of individuals who

provided statements that corroborated the accusations against Mr. Eckstein.

107.    It is significant that at after this complaint was filed, Mr. Eckstein was the

person who was charged with reviewing Oxford's revised Safety Plan submissions, which he

repeatedly rejected for unjustified reasons as described in Count II below.

108.    The investigation into allegations of "racism, abuse, and unprofessional

behavior," which was initiated at the request of Oxford and a victimized subcontractor, was

undertaken by a Major Collier, who reported his findings to the Contracting Officer, LTC

Solinsky.

109.    It was not until February 1, 2022, during a time when LTC Solinsky was very

much in the midst of executing his plan to terminate Oxford for default, that the results of the

investigation were communicated to Oxford.

110.    Despite the overwhelming evidence of abusive conduct by Mr. Eckstein, LTC

Solinsky stated that the investigation had been completed on November 30, 2021 (two full

months earlier) and incredibly concluded, without any substantive explanation, that "the

accusations against Mr. Eckstein were unfounded."

111.    Through unwarranted suspension of work, as will be more fully explained in Count II, failure to acknowledge Government-caused and COVID-19 excusable delays, and unreasonable rejection of key personnel, the Defendant ensured that its criticism of Oxford for not satisfactorily progressing the work would become a self-fulfilling prophecy that would further the Contracting Officer's plan to terminate Oxford.

112.    By letter dated December 16, 2021, the Defendant stated that Oxford's QC Manager and QC Civil were "unfit for their positions and no longer allowed on site."  The Defendant had not previously criticized either of these specific individuals' performance on the job.  To the contrary, both of these individuals had received praise from the Defendant on a number of occasions.

113.    The removal of these individuals from the site was unsupported on the merits, manifestly unfair, and completely ignored the qualifications and performance of these individuals that spanned many years on prior projects in Israel.  It also ignored the fact that Oxford demonstrated that the Defendant had simply mistaken the translation, by one of the QC individuals, of a subcontractor comment and, incredibly, this misunderstanding became the basis for their dismissal.

114.    The Defendant's misunderstanding of the translation occurred on an occasion when these individuals were performing their quality control responsibilities in an exemplary manner.  A subcontractor had disobeyed Oxford's QC Civil's explicit instructions regarding execution of a concrete CAP and was promptly dismissed from the project when this was reported to Oxford's management.  This appropriate exercise of the quality control function demonstrated that these individuals were eminently "fit" for their positions and defendant's

23

direction to remove them from the project was arbitrary, capricious, and wholly unwarranted under the circumstances.

115.    By letter dated December 31, 2021, Oxford fully explained the events that had occurred and notified the Defendant that it was unaware of even a single criticism of the performance of these two individuals in the past.

116.    This limitation on the further involvement of the QC Manager and QC Civil effectively prevented Oxford from proceeding with any other work on the project, remedial or otherwise.

117.    On January 10, 2022, after realizing this unintended consequence caused by the dismissal of Oxford's QCM and QC Civil, the Defendant reinstated these same employees, as an "interim accommodation," to oversee quality control on the far more critical contract work at Sites A & B.  Work at Models P & L remained suspended until the Defendant terminated the Contract on March 1, 2022.

118.    This "accommodation" made no sense, and totally contradicted the Defendant's assertion that these persons were incapable of performing their quality control functions in a competent manner.

119.    The suspension of these critical QC employees led directly to the cessation of all critical path work at Models P & L until the Defendant terminated the Contract on March 1, 2022.  This also contributed to the excusable delay addressed in Count II.

120.    At numerous times, the Defendant objected to the qualifications of other Oxford key personnel and directed their removal and replacement.  These directives were arbitrary and

capricious and were designed to make it difficult, if not impossible, for Oxford to successfully complete its work on the project.

121.    The Defendant unreasonably rejected Oxford's submission for approval of key personnel, even though those individuals were qualified and had been approved by USACE for similar positions on other projects in the past.

122.    The Defendant gave no consideration to the fact that it was very difficult to bring American personnel into Israel because of the stringent COVID-19 travel restrictions in Israel and throughout the world at that time.

123.    Key personnel were often rejected for minor (and highly debatable) deviations from what USACE unreasonably determined were Contract requirements, and the Defendant showed no flexibility where flexibility was called for and would have been practical.

124.    This lack of flexibility and cooperation by the Defendant contradicted its contention that the project was "urgent."  The actions of USACE contradicted any real consideration of project urgency and the only thing that truly seemed to be "urgent" was the Contracting Officer's plan to terminate, and ultimately ruin, Oxford.

125.    Following its December 16, 2021 Suspension of Work, the Defendant intentionally misrepresented its willingness to consider corrective actions that Oxford had taken and induced Oxford to continue expending resources under the belief that the Defendant would allow Oxford to complete the project.  At the time of that inducement, Defendant had already decided that it was going to terminate Oxford for default.

126.    The Contracting Officer abused his authority and applied his superior bargaining position in a manner that made it impossible for Oxford to satisfy his demands in a timely manner.

127.    The Contracting Officer made it known, well in advance of his issuance of the termination for default, of his intention to prevent Oxford from performing any future work in Israel or anywhere within the jurisdiction of the Europe District.

128.    The Contracting Officer's overly-aggressive administrative treatment of Oxford was, in fact, part of a programmatic assault on Oxford.

129.    The Contracting Officer intended, and carried out a plan, to bring about the financial ruination of Oxford, and actually was successful in achieving the goal of preventing Oxford from obtaining other USACE work within the Europe District, Oxford's longstanding DoD customer.

130.    Defendant's onsite personnel were aware of the plan to terminate Oxford well before the official determination was communicated to Oxford or its surety, and they made some of Oxford's field personnel aware of the fact that the die had already been cast.

131.    The communication of the imminent termination for default to Oxford personnel, at the very time that the Defendant had approved new contractor personnel and was encouraging Oxford to continue performance, was outrageous, demoralizing to Oxford's onsite personnel, and amounted to tortious interference of the business operations of Oxford.

132.    The Defendant hosted Oxford and its U.S. based counsel in Tel Aviv, Israel on February 1, 2022 and continuing on February 3, 2022 for in-person discussions regarding the status and completion of the project.  Those from, and acting on behalf of, Oxford traveled at

great distance and cost to attend these meetings.  During those discussions, USACE expressed a commitment to work collaboratively with Oxford to complete the project.  Prior to these meetings, however, it is now apparent that the Defendant had already decided to terminate Oxford for default.

133.    The Defendant, at the very time that Oxford was being permitted and encouraged to continue performance, was engaging in negotiations with a potential replacement contractor.

134.    These negotiations were kept secret from Oxford and its surety and were in violation of the Defendant's obligations under the Termination for Default requirements in the FAR (see FAR 49.402-3(e)(2)).

135.    The fact that these discussions and negotiations were being held behind the backs of Oxford and its surety demonstrates that the Defendant had no intention of allowing Oxford to cure its alleged deficiencies, and that Oxford's Termination for Default had been unalterably pre-decided.

136.    The Defendant's secret negotiations were in derogation of the surety's rights under the Performance Bond and breached the Defendant's duty to afford Oxford and its surety an opportunity to mitigate damages.

137.    The Defendant's conduct breached its duties under the implied covenant of good faith and fair dealing and also amounted to bad faith, and this conduct is sufficient to justify a conversion of the Termination for Default to a Termination for Convenience of the Government.

## COUNT II – THE PLAINTIFF IS ENTITLED TO A TIME EXTENSION RESULTING FROM EXCUSABLE DELAY

138.    Oxford reasserts the allegations contained in the paragraphs above and incorporates them herein by reference.

139.    Under the express terms of its contract with Oxford, the Defendant could not default Oxford for failing to timely complete work under the contract if "[t]he delay in completing the work [arose] from unforeseeable causes," such as "acts of the Government," "quarantine restrictions," or "epidemics" that were "beyond the control and without the fault or negligence" of Oxford.

140.    The Defendant's allegations that "Sites A and B are currently 655 days beyond the contract completion date and Sites P and L are 435 days beyond the contract completion date," as stated in the Termination for Default letter, were factually incorrect, and failed to consider the time extensions that Oxford had already requested and that should have been granted to the Plaintiff.

141.    The Defendant refused to pay Oxford for work performed and used its denial of Oxford's schedule updates as a reason for those refusals.  As a result, Oxford was not being fully compensated for many months for work it performed.  In fact, the Defendant's last payment to Oxford for work it performed occurred on August 25, 2021.

142.    The Defendant allowed Oxford to continue to perform well beyond the Contract Completion Date of August 7, 2020 for CLIN 0001 and December 19, 2020 for the remaining CLINs and never established a new Contract Completion Date.

143.    There were numerous modifications to the Contract under the Changes clause that deferred consideration of a time extension, but such consideration was never granted by the Defendant.

144.    The numerous excusable causes of delay resulting from the pandemic, as well as responsibility for other compensable Government-caused delays were ignored by the Defendant and all slippage of the schedule was improperly and unfairly blamed on Oxford.

145.    Not a single day of additional time was granted by the Defendant even though it knew that Oxford was entitled to a substantial extension of time.

146.    If the Defendant had performed a proper, and fair, delay analysis at the time it issued its Cure Notice, it would have resulted in an extension of time that would have demonstrated that Oxford was, in fact, not late in its performance, and certainly not so late as to justify a termination for default.

147.    It was standard practice for USACE to defer any discussion, or negotiation, of additional time that Oxford was due for a later time, but that "later time" never arrived.

148.    The Defendant failed to grant appropriate time extensions, to consider mitigating circumstances, and to permit the continuation of remedial actions that were underway that would have resolved all of the alleged justifications for the termination for default.

149.    Oxford's alleged failure to timely perform the work resulted from the Defendant-caused delays, the failure of the Defendant to carry out its duties in a reasonably timely-fashion, unjustified suspensions, and an obstructionist posture that directly and adversely impacted Oxford's ability to progress the work.

29

**Design Phase**

150.    At the outset of the project, Oxford requested critical design meetings that were delayed for unreasonable periods of time.  When the requested meetings did take place, Defendant or the Israeli Ministry of Defense ("MOD") insisted on changes that necessitated Oxford having to reassess and/or reconfigure its planned design numerous times.

151.    By way of example, on June 25, 2019, Oxford requested a meeting with the MOD Fire Safety Regulator, who did not meet with Oxford until August 25, 2019.  This meeting led to significant changes in the safety design that could have been implemented earlier if the Defendant had facilitated this critical meeting promptly.  Oxford assumed reasonably that the meeting could have been (and should have been) scheduled and held within seven (7) calendar days from its request.  Therefore, Oxford asserts entitlement to a 54-day extension of the CCD.

152.    On June 25, 2019, Oxford also requested a meeting with the Defendant to discuss changes to the Contract's dry storage requirements, but the Defendant never scheduled the meeting.  Instead, the Defendant forced Oxford to engage in a slow Request for Information ("RFI") process, involving RFI Nos. 2, 7, 8, and 14.  Compelling Oxford to go through the RFI process led to additional project delay that could have been avoided had the Defendant met with Oxford, as requested.

153.    On January 28, 2020, Oxford sent the Defendant serial letter "S-2020-1001" regarding a series of design delays that impacted CLIN 0001 (e.g., the two month delay in setting a critical meeting with MOD fire safety regulator, which led to significant design safety changes, and changes to Dry Storage requirements) and CLIN 0002 (e.g., changes to the size of Model P).  Defendant did not respond to this letter.

154.     On June 29, 2020, Oxford submitted its building permit application to the Defendant for review.  By Contract, the Defendant was to return this submittal within fourteen (14) days, but did not review and return the building permit to Oxford until seventy-four (74) days later on September 11, 2020.  This resulted in a delay to Oxford's work of sixty (60) days.

155.     The Plaintiff encountered Government-caused delays that resulted from defendant's late review of design submittals, including the 35% design and the 95% design. The Contract required that it review and return design submittals within 21-days of submission by Plaintiff.  The Plaintiff submitted its 35% design submission on January 30, 2020, which defendant did not return to Plaintiff until March 9, 2020.  The Plaintiff submitted its 95% design submittal on March 29, 2020, which the Defendant did not return until April 28, 2020. Collectively, these two delays amounted to a 28-day delay to the project's critical path.

156.     The Plaintiff also experienced delays caused by changes requested by the Israeli Air Force ("IAF") at various design meetings and these requests were endorsed by the Defendant.

157.     Numerous delays were also experienced by the Plaintiff resulting from Government delays in responding to questions and the Defendant's failure to promptly resolve conflicts and ambiguities in the Contract specifications.

**COVID-19 Delays of Critical Path Supplies**

158.     On March 25, 2020 and again on May 31, 2020, Oxford formally notified the Defendant that global lockdowns and movement restrictions instituted in response to the COVID-19 pandemic adversely impacted the availability of Oxford's management personnel, professionals, design team, construction laborers, and subcontractors, as well Oxford's ability to procure critical materials for performance of the work.

31

159.    Oxford's May 31, 2020 letter requested a 69-day extension to the Contract

Completion Date ("CCD") because its order of crucial cladding material from Italy, a country

devastated (and virtually closed to the world) by COVID-19 at the time, had to be canceled.

Oxford immediately sought an alternate supplier in a different country.  The Defendant never

responded to Oxford's request for a time extension despite acknowledging that COVID-19

lockdowns and nationwide movement restrictions impacted Oxford on another Israeli project,

Contract No. W912GB18D0032 / Delivery Order No. W912GB19F0111, Site 13900 -

Squadron VAV, Israel, being performed in the same timeframe as this contract.

160.    Despite the acknowledgement of, and request for a change proposal pertaining

to, COVID-19's impact on the Site 13900 contract, the Defendant did not issue a similar RFP

for this Contract nor did it consider COVID-19 impacts on Oxford's progress prior to

terminating Oxford for default.

### Government Change Requests

161.    The Defendant requested numerous changes that affected the critical path of the

project.  Some of these changes became the subject of bilateral contract modifications.  Oxford

responded promptly to the Defendant's change requests by providing proposals for the work

requested only to then have the Defendant take inordinate and unreasonable amounts of time to

address those proposals and issue contract modifications that allowed Oxford to proceed with

the requested change work.

162.    For example, on July 13, 2020, the Defendant, seeking an extension of the

retaining wall at Building P, issued Oxford a Request for ("RFP") proposal to add this work to

the Contract.   Oxford provided its proposal on July 27, 2020.  Similarly, on August 5, 2020,

the Defendant issued an RFP to Oxford for the installation of anti-bird netting, for which

Oxford submitted its proposal on August 17, 2020.  Despite Oxford's prompt responses, the Defendant did not execute the modification (Modification A00006) for these changes until June 10, 2021, nearly 11 months and 9 months following Oxford's submission of its proposals.

163.    Contract modifications frequently did not grant time extensions for the performance of the changed work, instead expressly leaving the subject of a time extension open as an item for later negotiation.

164.    For example, Modifications A00006 and A00010 both stated, "This modification does not address any time impacts, either excusable or compensable, which may result in an increase in the time to perform the work required by this contract."  This carve-out language was in accord with the Defendant's routine practice of deferring discussions concerning time and time-related costs, which Oxford repeatedly acquiesced to and accommodated in a spirit of cooperation.

165.    On April 13, 2021, Oxford provided the Defendant with an overall project schedule analysis reflecting the time impact resulting from a number of change requests issued by the Defendant.  These changes impacted critical path activities across CLINs 0001, 0003, and 0004.  Oxford also provided a detailed narrative explaining how each change request affected Oxford's schedule, including changes in the sequencing of work.  The resultant delays from the Defendant's administration of the change request process spanned 285 days.

166.    During the previously referenced June 25, 2021 meeting, Oxford met with the Defendant to discuss, *inter alia*, the status of this project.  Oxford reminded the Defendant that its previous time impact analysis showing the 285-day delay associated with the Defendant's change requests had not been addressed and that the Defendant must consider this delay with respect to the project schedule at the time.  During the meeting, the Defendant failed to engage

with Oxford regarding this time impact and the Contracting Officer admitted that he was not even aware of Oxford's requests for extensions of time based upon Government-caused or excusable delays.

167.    LTC Solinsky did not address the time-related impacts of changed work before terminating Oxford for default for failing to make progress.

### August 18, 2021 Safety Incident

168.    On August 19, 2021, the Defendant suspended all "concrete construction works to include reinforcement work, formwork installation, or concrete placement at Site 13664" because of alleged deficient concrete work at Site L, as well as an alleged safety violation resulting from a laborer working on an uninspected scaffold.

169.    The alleged deficient work did not justify a suspension of work.  Nor did the purported safety violations justify a suspension of the work under the applicable Defendant's Safety Manual, EM 385-1-1, as there were no safety incidents or accidents that occurred.  In fact, Oxford immediately responded by dismissing the two workers who had ignored the safety requirements and promptly implemented safety training in accordance with Oxford's approved safety program.  Oxford reinforced to all workers that they must comply with all safety requirements or face dismissal.

170.    Prior to Oxford being permitted to resume work, the Defendant directed that Oxford submit a remedial Safety Plan for approval, which the Defendant subsequently rejected. Oxford addressed all of the Defendant's comments and concerns in the next iteration of the remedial Safety Plan only for the Defendant to reject this plan on entirely new grounds.

171.    Following the Defendant's successive and groundless rejections of its remedial Safety Plan, Oxford, seeking to understand precisely what the Defendant was looking for, met with defendant's Quality Assurance Representative ("QAR") for the project.

172.    In that meeting, the QAR explained exactly what Oxford's remedial Safety Plan should contain.

173.    Following its meeting with the QAR, Oxford prepared another remedial Safety Plan.  This plan addressed every required element that the QAR conveyed was necessary for defendant's approval.  Incredibly, the Defendant rejected this plan as well.

174.    The Defendant did not approve Oxford's remedial Safety Plan until December 2, 2021.

175.    The Defendant required a number of remedial Safety Plans before permitting Oxford to resume work thereby unreasonably delaying the project for 109 days.

### Gaza Conflict

176.    Due to an armed conflict in the Gaza strip in May 2021, the Israeli MOD restricted access to Ramon Air Force base, as well as other military installations, for two weeks.  This restriction precluded Oxford from accessing the project site for a 14-day period.

### Suspension of Work at Model P

177.    On June 12, 2020, the Defendant suspended work at Model P due to the Israeli Air Force's concerns regarding helicopter flight paths over the site.

178.    At the time of this suspension, Oxford had already prepared the earthworks and was ready to start the drilled pile works.  Oxford immediately notified the pile works contractor not to bring the drill rig to the site and to reduce his work force from six workers to two workers, who were necessary to preserve the site.

179.    On July 7, 2020, Oxford submitted an REA requesting an 11-day time extension resulting from this suspension of the work.  The Defendant never addressed the matter.

180.    In total, Oxford is entitled to a 744 calendar-day extension of the CCD, a period that overcomes the alleged amount of time that the Defendant contends Oxford was delinquent in progressing the project as of the date of termination for default, March 1, 2022.

181.    The Defendant failed to grant appropriate time extensions, to consider mitigating circumstances, and to permit the continuation of remedial actions that were underway that would have resolved all of the alleged justifications for the termination for default.

182.    The Defendant refused to consider or acknowledge its own responsibility for delay and it failed to produce a delay analysis in support of it calculation of delays allegedly caused by the Plaintiff.

183.    On December 1, 2022, Oxford submitted a certified claim, under the authority of the Contract Disputes Act, for a time extension of 744 calendar days.  The requested time was not granted and the Contracting Officer did not issue a Final Decision within 60 days or notify Oxford of the time within which a Final Decision would be issued**,** as required by the Contract Disputes Act.

## COUNT III – THE DEFENDANT MATERIALLY BREACHED THE CONTRACT

184.    Oxford reasserts the allegations contained in the paragraphs above and incorporates them herein by reference.

185.    As a defense to the Government's termination for default, a contractor may assert that the Government committed a prior material breach.

186.    The Contract authorized the Defendant to withhold a maximum of 10% from any progress payment submitted by Oxford if satisfactory progress had not been made during the period.

187.    Oxford submitted twenty-four pay applications over the course of the project and prior to the Defendant's termination of the Contract.  Oxford also prepared Pay Application No. 25 ("Pay App No. 25") in the amount of $754,932.00 and requested payment in full for numerous work activities that were 100% complete.  For work activities that were not 100% complete, Pay App No. 25 sought payment corresponding to the percentage of the work completed measured against the budgeted dollar value for those items.

188.    Pay App No. 25 also included work that was 100% complete and that had been billed previously to the Government under several preceding invoices, but remained entirely unpaid.  For example, Oxford had completed 100% of Activity 59460 Building Maintenance-Concrete Walls Casting and had billed for the work in every payment application since Pay App No. 21 in March of 2021.  The Contracting Officer's Representative (the "COR") ultimately approved payment for 90% of the work, but subsequently rejected payment of that amount without informing Oxford.  Oxford has still not been paid any amount for that work.  The non-payment for completed work was a material breach of the Contract by the Defendant.

189.    Oxford informed the Defendant that its failure to make any payment for work was not in accordance with the Contract, and was placing financial strain on the company.

190.    On January 21, 2022, Oxford's president, Mr. Jarred Yaron, met with the ACO to discuss Pay App No. 25.  During that meeting, the ACO agreed to pay Oxford for certain work activities listed in the payment application.  In sum, the ACO committed to pay Oxford, without condition, $101,922.50 of the $754,932.00 requested, or roughly 13% of Pay App. No

25.  The refusal to make payment in full, less an authorized ten-percent retainage, did not comply with FAR 52.232-5 Payments Under Fixed-Price Construction Contracts, which was incorporated by reference into the Contract.

191.    On January 24, 2022, the ACO revoked his unqualified agreement to pay $101,922.50 and informed Mr. Yaron via email that he would authorize the agreed-to payment if Oxford demonstrated a return to construction work at Sites A & B.  The ACO also reiterated that Oxford did not yet have an approved schedule.

192.    The conditions of payment that the ACO was now holding over Oxford had not been agreed-to, let alone discussed, during the ACO and Mr. Yaron's January 21, 2022 meeting.  In any event, Oxford had been at Sites A and B that very week performing cladding and curbstone work and was in the process of preparatory and initial meetings for commencement of additional construction activities at Sites A and B.

193.    Oxford was bending over backwards to please the Defendant and comply with its requirements, despite the fact that it was not being paid, was continuing to "bleed" money, and was being subjected to administrative obstacles designed to make compliance with the Contracting Officer's directives impossible.

194.    As explained above, Oxford was the victim of the violation of the covenant of good faith and fair dealing on three projects simultaneously and received only one payment after January, 2021until March 1, 2022 (the Ramon payment on August 25, 2021).  Oxford received no payment whatsoever on Nevatim, and no payment on the Navy Kitchen project from January, 2021, through its no-cost Termination for Convenience in February, 2022.

195.    Contrary to defaulting on its obligations on Ramon, or on the other two projects, Oxford took on a tremendous financial burden and did everything possible to proceed despite

the overwhelming violation of the covenant of good faith and fair dealing, and the duty to cooperate, that was continually exhibited by the Defendant.

196.    There is no regulation or contract clause that permitted Defendant to withhold progress payments in consideration of the possibility that it might terminate Oxford for default at some future, yet undetermined, time. The Defendant had no contractual right to withhold progress payments from Oxford, except for a ten percent retainage amount.

197.    The Defendant's refusal to make payment in any amount on the Ramon Pay App. No. 25 based on the lack of an approved schedule was not justified.

198.    The Defendant continually, and unreasonably, refused to approve proper schedule updates submitted by Oxford and then complained that Oxford had failed to furnish a Contract compliant schedule.

199.    It was entirely up to the Defendant to determine what was a "compliant" schedule and its unreasonable rejections of Oxford's schedules, which were actually compliant, was done to avoid giving Oxford the time extensions to which it was entitled.  Such time extensions, had they been granted, would have thwarted the Contracting Officer's pre-ordained plan to terminate Oxford for default.

200.    On December 5, 2021, Oxford submitted Transmittal No. 01320.00 10-9.3, which constituted a contract compliant schedule showing an anticipated completion date of August 1, 2022.  Oxford's approved scheduler, who had substantial experience in project scheduling, prepared this schedule and, until his involvement with this Contract, had never any schedule submitted for a USACE project rejected.

201.    Oxford also engaged an outside scheduling consultant that had decades of experience preparing and/or reviewing project schedules on behalf of USACE.  It was, and

remains, his professional opinion that the schedule Oxford submitted on December 5, 2021 should have been approved by USACE.

202.    On December 28, 2021, USACE wrongfully rejected Oxford's December 5, 2021 schedule.

203.    Oxford submitted another contract compliant schedule on January 9, 2022.  The Defendant wrongfully rejected this schedule as well.

204.    The collective import of the Contracting Officer's unreasonable conduct, including his failure to cooperate with Oxford in a reasonable manner, overlooking the misconduct by members of his team, refusing to grant, or even address, time extensions that were due, not paying for work that had been completed, actively preventing Oxford from carrying out CAPs that had been approved, and engaging in a plan to injure Oxford by misleading it into believing that by continuing to fund approved corrective actions it would prevent the termination for default that had secretly been planned for months, was a material breach of the Contract.

205.    The Contracting Officer had no intention of allowing Oxford to complete its CAPs or of approving its revised schedule because he knew that by doing so his plan to put Oxford out of business would be thwarted.

206.     Because the Defendant's prior material breach excused Oxford's performance, the Contracting Officer's decision to terminate Oxford for default cannot be sustained.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court issue an Order declaring the Contracting Officer wrongfully terminated the Contract for  default; an Order declaring that the Termination for Default must be converted to a Termination for the Convenience of the

Government that will effectively result in the reimbursement to Oxford of all of the costs it incurred in the performance of the project, including, but not limited to, the remaining Contract balance, remission of liquidated damages, plus all sums owed or paid to its surety, Liberty Mutual, plus overhead and profit.  Accordingly, Oxford requests that the Court enter judgment against the Defendant, together with any other relief as the Court deems appropriate.

Dated: February 27, 2023                    /s/ Michael H. Payne
                                            Michael H. Payne, Esquire
                                            Cohen Seglias Pallas Greenhall &
                                            Furman, PC
                                            1600 Market Street, 32nd Floor
                                            Philadelphia, PA 19103
                                            Email: mhpayne@cohenseglias.com
                                            Phone 215-564-1700
                                            Counsel for Oxford Federal, LLC

Co-Counsel:
Stephen D. Tobin, Esquire
Cohen Seglias Pallas Greenhall & Furman PC

41